UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

NETANEL MILLER, CHAYA MILLER and ARIE
MILLER,

                       Plaintiffs,

       -against-

ARAB BANK, PLC,
                 Defendant.

-------------------------------------------------------------------X

**COMPLAINT**

**JURY TRIAL DEMANDED**

Netanel Miller, Chaya Miller, and Arie Miller, by their attorneys, allege the following upon

information and belief:

## NATURE OF THE ACTION

1.     This is a complaint for damages and equitable relief arising out of the conduct of

the Arab Bank, PLC ("Arab Bank"), a Jordanian bank headquartered in Amman, Jordan with a

federally licensed and regulated branch office in the state of New York. Defendant has and is

continuing to knowingly and willfully provide, distribute, and administer the distribution of

financial benefits, money and financial services to (a) terrorists who have killed, injured and

maimed civilians, or attempted to do so, (b) the families and beneficiaries of such terrorists, and

(c) Foreign Terrorist Organizations (as that term is defined in 8 U.S.C. § 1189 of the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")), as part of a scheme to

encourage and facilitate acts of international terrorism as defined by 18 U.S.C. § 2331.

2.     By these acts, defendant Arab Bank has aided and abetted and conspired to

commit said acts of international terrorism, resulting in the killing, attempted killing and

maiming of scores of American citizens in Israel since September 2000, and has violated the

prohibitions on providing material support for acts of international terrorism set forth in the Anti-

Terrorism Act as amended by the AEDPA ("ATA") (see e.g., 18 U.S.C. §§ 2339A, 2339B and

2339C) and is civilly liable under § 2333(a) of the ATA to those American citizens (and their

estates, survivors and heirs) who have been killed or injured in their person, property or business

by reason of such acts of international terrorism.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331, 28 U.S.C. § 1332(a)(2), and 18 U.S.C. §§ 2333(a) and 2334, as a civil action brought by

citizens of the United States, their estates, survivors, and heirs who have been killed or injured by

reason of acts of international terrorism.  This Court also has subject matter jurisdiction over this

action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2).  The matter in

controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  This Court also

has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367(a).

4.      Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C.

§§1391(b) and 1391(d).

5.      Arab Bank is subject to personal jurisdiction in the state of New York pursuant to

N.Y. CLPR § 301 because, among other things, it continuously and systematically does business

in the state of New York.  Arab Bank is also subject to personal jurisdiction in the State of New

York pursuant to N.Y. CPLR § 302 because, based on the facts alleged herein and upon

information and belief, Arab Bank (a) transacts business within the State of New York; (b)

contracts to supply goods and services in the State of New York; (c) has committed tortious acts

within the State of New York and (d) has committed tortious acts outside the State of New York

causing injury within the State of New York and (i) derives substantial revenue from goods used

or consumed in the State of New York or (ii) expected or should reasonably have expected such acts to have consequences in the State of New York and derived substantial revenue from international commerce. Arab Bank is also subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a).

## THE PARTIES

### A.    The Plaintiffs

6.    Plaintiff Netanel Miller, age 22, is a citizen of the United States and a resident of Dade County in the State of Florida.

7.    Plaintiff Chaya Miller is a citizen of the United States. Plaintiff Arie Miller is a citizen of the State of Israel. They are the parents of plaintiff Netanel Miller and reside in Israel.

### B.    The Defendant

8.    Defendant Arab Bank is a Jordanian bank with headquarters in Amman, Jordan. Arab Bank is majority-owned and controlled by the shareholders of Arab Bank Group, a Jordanian holding company. Its common stock is publicly traded on the Amman Stock Exchange. Arab Bank and Arab Bank Group constitute a single Jordanian banking institution. Arab Bank owns, controls and/or operates bank branches worldwide, including several branches that are situated in Palestinian Authority-controlled territories and a wholly-owned branch office located at 520 Madison Avenue, New York, New York, that is regulated by the Comptroller of the Currency of the United States Treasury Department. Arab Bank conducts business in, and is registered to conduct business under, the laws of the State of New York.

9.      Arab Bank and Arab Bank Group are majority-owned and/or controlled by members of the Shoman family, including Abdel Hamid A.M. Shoman, who is the Chairman of Arab Bank and Arab Bank Group.

10.     The Office of the Comptroller of the Currency effectively closed the New York branch of Arab Bank on February 24, 2005, and has since converted the branch to an "agency" within the meaning of federal banking law.  Arab Bank had operated its federally chartered branch in New York from 1983 until that date.  The New York branch is designated as a wholesale bank, and among the banking and financial services that it conducts in New York is the provision of clearing and correspondent bank services to its foreign bank branch offices and affiliated banking institutions that are also owned and/or controlled by the Arab Bank Group as well as other foreign banks.

## THE BEN YEHUDA BOMBINGS: DECEMBER 1, 2001

11.     In the late evening of December 1, 2001, Nabil Halabiya and Osama Mohammad Id Bahr, two HAMAS-trained terrorists, blew themselves up in a pedestrian mall in Jerusalem as part of a coordinated double suicide bombing.  A large quantity of nails was packed with each of the bombs.  Eleven (11) people were murdered and more than one hundred (100) people were injured.  Mr. Bahr had been recruited by Jamal al-Tawil the chairman of the Al-Islah Charitable Society, one of HAMAS's key charitable front organizations in the West Bank.

12.     After the two suicide bombings terrorists detonated a car bomb near the site of the first two attacks.  HAMAS also claimed responsibility for the attack.

13.     The Bahr family of Abu Dis, which is near Jerusalem, received a payment through its account at the Arab Bank from the Saudi Committee for twenty thousand (20,000) Riyals converted into five thousand three hundred and sixteen dollars and sixteen cents ($5,316.16).

14.     On the evening of December 1, 2001, plaintiff Netanel Miller was with friends enjoying ice cream at the pedestrian mall in Jerusalem.  One of the suicide bombers detonated his explosives a few feet from Netanel and his friends.  Netanel had his back to the bomber, and he was thrown to the ground as a result of the explosion.

15.     A bolt from the bomb lodged in the upper part of Netanel's leg.  Other bolts hit him in the back, resulting in burns.  His hand and knee were also injured.

16.     Netanel, in shock and unaware of the severity of his injuries, attempted to walk home, limping on his injured leg.  After walking approximately 30 feet, Netanel collapsed on the sidewalk.  Only then did Netanel become aware of how much he was bleeding from the wounds he sustained in his leg.  His attempts to use pressure to stop the bleeding were unsuccessful.

17.     Some people stopped to help him, and Netanel handed them his cellular phone, asking them to call his parents, plaintiffs Arie and Chaya Miller.  Netanel spoke to his father, who had been an Army medic.  Mr. Miller asked Netanel specific questions about his condition and insisted Netanel seek medical help.

18.     Ultimately, Netanel was taken to the Shaare Zedek Hospital by ambulance.  Since Netanel had lost a great deal of blood, he was given a blood transfusion.

19.     Netanel telephoned his parents, and Mr. Miller came to the hospital.  Mrs. Miller arrived an hour or so later after she found someone to stay with her other children at her home.

20.     Netanel was admitted to the hospital and remained there for two days.

21.     Netanel endured the pain in his leg for nearly two years.

22.    The pain in Netanel's leg became so severe he had to undergo surgery, and the bolt that was still lodged in his leg was finally removed.

23.    As a result of the flashbacks and severe pain, Netanel also underwent treatment by a mental health professional.

24.    As a result of the attack, plaintiff Netanel Miller has suffered severe physical and mental anguish and extreme emotional distress.

25.    Upon learning that their son, Netanel, had been injured in the bombing, and knowing he has suffered as a result of those injuries, plaintiffs Chaya Miller and Arie Miller experienced great concern and anxiety.

26.    As a result of the attack, plaintiffs Chaya Miller and Arie Miller have suffered severe mental anguish and extreme emotional distress.

## FACTUAL ALLEGATIONS

### The Al Aqsa Intifada or Intifada Al Quds

27.    Following the collapse of the peace negotiations at the presidential retreat at Camp David in the summer of 2000, Palestinian terror organizations launched a broad-based terror campaign against the State of Israel.

28.    This explosion of violence was widely termed the *Al Aqsa Intifada* or *Intifada Al Quds* (Hereinafter: "Second Intifada").

29.    This Second Intifada was both qualitatively and quantitatively different from prior waves of Palestinian terrorism.

30.    The objectives of the Second Intifada terror campaign include intimidating and coercing the civilian population of Israel and attempting to influence the policy of the Israeli

government by compelling Israel to withdraw from territory it presently controls.

31.     The preferred method of mass murder used by Palestinian terrorist groups is the suicide bombing which involves an individual carrying an explosive device which he or she detonates in a bus, restaurant or other crowded public gathering place.

32.     The device is typically packed with nails, bolts and ball bearings, which, when detonated, lodge themselves deep within the bodies of those unfortunate individuals who happen to be inside the blast radius, causing cruel and horrific injuries.  The suicide bomber is thereby regarded as a "martyr" (or "shahid" in Arabic) by the terrorist groups and their sympathizers.

33.     Because many suicide bombers are stopped and killed before they can successfully detonate their explosive charges and others have died as a result of premature or accidental detonations, the term "martyr" has generally been used by these organizations to include both "successful" suicide bombers and all others killed in the course of attempts to commit acts of violence against Israeli or Western targets.

34.     The eruption of the Second Intifada in late September 2000 changed the dynamics of Palestinian terrorism in four material respects:

> A.     The Second Intifada, from its inception, was marked by a massive escalation of violence, which quickly transformed the tactics of the Islamist terrorist groups from the margins to the mainstream of Palestinian politics.
>
> B.     The unrestrained violence of the Second Intifada and the increasing credibility and prestige it provided for the Islamist groups forced other (secular) Palestinian terrorist groups to adopt Islamist rhetoric and tactics.
>
> C.     The main rival terrorist groups began cooperating and coordinating their activities.
>
> D.     The Second Intifada coalesced Saudi financial support for HAMAS into a more ambitious and more formal structure through the

formation of the Saudi Committee in Support of the Intifada Al Quds.

35.    Whereas the total number of attacks from 1993-2000 was fewer than 1,000, since September 2000 various Palestinian terrorists have attempted approximately 23,000 attacks, which have claimed more than 8,000 casualties, including more than 1,000 civilian deaths. At least 30 U.S. citizens have been killed as a result of these indiscriminate acts of violence, and scores of others have been seriously injured.

## The Islamic Resistance Movement (HAMAS)

36.    Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably the Islamic Resistance Movement ("HAMAS")[1]. HAMAS is primarily a radical Islamist terrorist organization that is committed to the globalization of Islam through violent "Jihad" or holy war.

37.    HAMAS is formally committed to the destruction of the State of Israel and to achieving their objectives by violent means, including acts of terrorism. The HAMAS Charter states that the very purpose of HAMAS is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad.

38.    The organization is nominally divided into two separate wings, the political wing which supports the so-called "Dawa" (its social service or humanitarian component) and the paramilitary wing known as the Izz-el-Din al Qassam Brigades. Although these two components have separate responsibilities, the organization operates seamlessly, with each component working to conduct the operations and achieve the illegal objectives of the terrorist group as a whole.

---

1 HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya," the Islamic Resistance Movement, which was founded in December 1987.

39.    HAMAS's social services are, in large part, administered by local "zakat," committees and other charitable organizations ("Zakat" means charity in Arabic). These committees and organizations are controlled by HAMAS by, inter alia, HAMAS members, operatives and activists sitting as members of their governing committees.

40.    Due to the substantial expenditures of the HAMAS organization and the fungible nature of money, significant sums of monies collected externally under charitable and humanitarian banners are routed for HAMAS's military and other operational uses, in addition to being used to free up other funds for specific terrorists acts. HAMAS uses such funds for, among other things, the provision of weapons, explosives, transportation services, safe houses, training and salaries for its terrorist operatives and for terrorist recruiters.

41.    HAMAS is a foreign organization dedicated to radical Islamist principles and the destruction of the State of Israel. It uses violence, principally suicide bombings, and threats of violence to pressure Israel to cede territory to the Palestinian people.

42.    HAMAS knowingly, willfully, and unlawfully combines, conspires, confederates and agrees to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder and numerous other acts of international terrorism activities as defined by 18 U.S.C. § 1331 and 18 U.S.C. § 2332, and other related acts of murder, attempted murder, solicitation to commit murder and providing material support to designated Foreign Terrorist Organizations in violation of the federal criminal code of the United States.

43.    On January 25, 1995, HAMAS was designated a Specially Designated Terrorist and, on October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS as a Foreign Terrorist Organization pursuant to Section 219 of the

Immigration and Nationality Act (the "INA") and the AEDPA. The formal designation has been
renewed every two years since 1997, including a renewal in August 2003.

44.    Since September 2000, HAMAS has launched hundreds of attacks targeting
civilians that have resulted in the deaths and injury of hundreds of individuals, including more
than twenty (20) mass murders that have killed more than three hundred and seventy (370)
civilians, including numerous American citizens. HAMAS has claimed responsibility for the
attack that injured plaintiff Netanel Miller.

**The Conspiracy to Finance Palestinian Terrorism**

**The Shoman Family**

45.    In 1984, the Shoman family that owns and controls Arab Bank, Plc published a
biography of Mr. Abdulhameed Shoman (the bank's founder) entitled, The Indomitable Arab in
which he consistently set forth his antipathy towards Jews, Zionists and the State of Israel. He
also clearly described his abhorrence for the United States, which he claimed to have once
admired, but then loathed because of its support for Israel.

46.    Prior to the establishment of Arab Bank, Abdulhameed Shoman described his
great anger toward Zionists, Jews, and others whom he believed stood in the way of the growth
of the Arab economy. In his biography he is quoted as saying that "…within a few years Zionism
will have grown strong enough to control the entire economy. I believe that all business dealings
with the Jews – buying, selling or banking transactions – are damaging to our country's best
interests."

47.    In his final speech before four hundred employees of Arab Bank, Mr. Shoman
also explained his hatred for Americans that had developed over the years:

I liked the Americans. I once bore their nationality, and gathered my fortune in

10

their country. But since they started to help the Zionists and supply them with arms to fight us, I have come to detest them. It was not the Jews, but the Americans, who fought us.

48.     Mr. Shoman's son, Abd Majeed Shoman, was the chairman of the Arab Bank and a vocal supporter of the Second Intifada until his death on July 5, 2005.

49.     He was the chairman of the Popular Committee in Support of the Palestinian Intifada which was established during the first Intifada in 1987-1988. The Committee managed to raise approximately eight million Jordanian Dinar (JOD 8,000,000) or approximately eleven million dollars ($11,000,000.00) for "martyrs' families," paying one thousand Jordanian Dinar (JOD 1,000) or approximately fourteen hundred dollars ($1,400.00) to each martyr's family and three hundred Jordanian Dinar (JOD 300) or approximately four hundred twenty five dollars ($425.00) to each Palestinian injured in the violence. From 1995 to 2000, the Popular Committee raised an additional one million two hundred thousand Jordanian Dinar (JOD 1,200,000) for the martyrs' families of the first Intifada.

50.     At an October 2000 meeting, Abd Majeed Shoman, and the other members of the committee discussed the need for a new mechanism to distribute the new donations that had not yet been transferred to the martyrs' families and the injured of the Second Intifada.

51.     They decided to bestow financial support to the martyrs' families on the same terms as before and to call upon the Jordanian government to make the donations tax-exempt. Abd Majeed Shoman, as Chairman of the Arab Bank, opened the meeting saying:

> After the blessed Intifada [erupted] I thought that we should discuss what to do about it. There are some organizations which are fundraising donations including the Welfare Association [headed by Mr. Shoman]. The Welfare Association received donations and it has funds. I received phone calls and donations from benevolent people and the Arab Bank's board and bank's employees decided to donate 5% from October's salaries [for the Intifada]. In spite of the fact that donations were collected and are available nothing was transferred to anybody. It

is our duty to act and therefore I summoned this meeting to hear from you.

52.     Mr. Shoman objected to locating the committee's office in the Arab Bank's Amman headquarters building but he left open the possibility of "loaning" an accountant to the committee.

53.     Ultimately, it was decided that the committee's office would be located in the Amman Chamber of Industry headquarters, where it in fact opened on November 1, 2000.

54.     As referenced by Mr. Shoman in his speech, on or about October 7, 2000, the Arab Bank announced that it would bestow financial donations to Palestinians injured during the Second Intifada. Its employees donated 5% of their monthly salary (for the month) to the Palestinian cause.

55.     All of this activity was conducted publicly in Jordan.

**The Saudi Committee in Support of the Intifada Al Quds**

56.     Similarly, on or about October 16, 2000, the Saudi Committee in Support of the Intifada Al Quds (hereinafter referred to as "Saudi Committee") was established as a private charity registered with the Kingdom of Saudi Arabia.

57.     According to the Saudi Committee, its purpose was to support the "Intifada Al Quds" and "all suffering families – the families of the martyrs and the injured Palestinians and the disabled."

58.     The Saudi Committee also established a website to promote its activities.

59.     The website was later revamped and the committee's name was sanitized on the English language version of the website.

60.     The sanitized Arabic version of the website that was available until early in 2005 stated that the committee's activities include: "**support of the families of martyrs and**

**wounded**, as well as the handicapped, orphans and prisoners, as well as homeowners whose houses were destroyed and landowners whose land was bulldozed, as well as support of a number of Palestinian social institutions and sponsorship of needy families ..."

61.    Subsequent to the filing of the related action in *Coulter v. Arab Bank, PLC*, 05 CV 365, on January 21, 2005, the Saudi Committee removed its website from the internet.

62.    In practice, the Saudi Committee constitutes a professional fundraising apparatus intended to subsidize the Intifada Al Quds, i.e., to subsidize the Palestinian terror campaign and to bankroll HAMAS and its related front organizations in the West Bank and Gaza. These goals are accomplished in two ways, both of which depend on the knowing participation and substantial assistance of the defendant Arab Bank.

63.    The first goal is accomplished by providing a comprehensive insurance benefit of $5,316.06 for the families of Palestinian terrorists such as Nabil Halabiya and Osama Mohammad Id Bahr, guaranteeing universal terrorist death and dismemberment insurance coverage to terrorists and their beneficiaries whenever a terrorist is killed.

64.    Lesser benefits are also provided if the terrorist is injured either by Israeli security forces or captured as a result of his or her criminal conduct.

65.    The Saudi Committee has provided millions of dollars as benefits to the families of the so-called "martyrs" and individuals killed by Israeli forces during the commission or attempted commission of terrorist acts, and to the families of Palestinians wounded during violent confrontations with Israel's security forces, as well as those activists held in Israeli custody. This type of support is critical to HAMAS's efforts to win the hearts and minds of the Palestinian people and to create an infrastructure solidifying HAMAS's position within Palestinian society.

13

66.     Moreover, the insurance benefit not only provides universal terrorist death and dismemberment insurance coverage for specific members of preferred terrorist organizations such as HAMAS, but is intended as universal terrorist death and dismemberment insurance coverage available to terrorists belonging to any terrorist organization or to none at all, thereby incentivizing and rewarding all terrorists in Israel and eliminating the potential distinctions between terrorist groups, between individual (freelance) terrorists and the more established terrorist cells, and between the secular and radical Islamist terrorist organizations.

67.     Defendant Arab Bank administers the comprehensive terrorist death and dismemberment insurance scheme by receiving, transmitting and distributing the benefits in accordance with lists of families of "martyrs" and others eligible for "coverage."

68.     Arab Bank actively participates in a formalized process which requires the families of so-called martyrs to obtain an official certification of their deceased relative's status as a bona fide martyr, replete with an individualized identification number.

69.     The Saudi Committee and representatives of the leading terrorist groups provided Arab Bank relatively detailed lists consisting of the names of the martyrs, personal information and details concerning the date and manner of death as well as other information via their charitable front organizations.

70.     Arab Bank, in consultation with the Saudi Committee and local representatives of HAMAS, finalizes the lists, maintains a database of persons eligible under this universal terrorist death and dismemberment insurance plan, receives the funds for the plan, and opens a dollar account for each beneficiary.  Every Palestinian family eligible under this universal terrorist death and dismemberment insurance coverage plan is encouraged to collect the terrorism benefits through a local branch of the Arab Bank in the West Bank or Gaza.

14

71.     If they choose to collect the insurance benefit, the families are required to present to the bank an "official" certification from the Palestinian Authority (replete with a unique identification number) establishing the bona fides of the martyr.

72.     If the documentation proves satisfactory and the designated family member presents satisfactory photo identification, Arab Bank issues a receipt to the designated recipient of the martyrdom insurance benefit.  For example, Dia A-Tawil perpetrated a suicide bombing attack on March 27, 2001, on behalf of HAMAS.  He was designated Palestinian Authority Martyr No. 449.  His father, Hussien Mohamed Farah Tawil, presented the "official" certification to the defendant Arab Bank, and received a confirmatory receipt stating that the benefit was paid to his Arab Bank account in Ramallah.

73.     The conspiracy between Arab Bank, the Saudi Committee and HAMAS and others is ultimately designed to provide substantial material support to Palestinian terrorist organizations and to provide a meaningful incentive both to prospective recruits and to individuals contemplating the commission of independent acts of violence in the name of the "popular resistance."  Arab Bank knew, and knows, that the purpose of the conspiracy and acts taken pursuant thereto is to encourage others to engage in terrorist activities, and to support the continued commission of terrorist activities.

74.     Arab Bank was and is aware of the methods and means by which HAMAS and other Foreign Terrorist Organizations seek to carry out their objectives.

75.     In fact, Arab Bank's own support and commitment to the violent goals of its co-conspirators are embodied by the personal commitment of Arab Bank's founder, Abdul Hamid Shoman and recently deceased chairman, Abdul Majeed Shoman.

76.     Thus on November 22, 2000 Arab businessmen held a meeting with Yassir

15

Arafat, and formed a new entity, the Fund for Support of the Persistence of the Palestinian People, to further bankroll the Palestinian Authority and the Second Intifada.

77.     Defendant Arab Bank pledged two million dollars ($2,000,000.00).

78.     Mr. Shoman personally pledged five hundred thousand dollars ($500,000.00).

79.     The Shoman family's altruism towards the Second Intifada continued in June 2001, when the Cultural Center of the Abdul Hamid Shoman Institute launched an exhibition on the subject of "the martyrs of the Palestinian Intifada." The stated purpose of the exhibit was to "honor to the martyrs of the blessed al-Aqsa Intifada" by means of conveying the human and spirited image of their lives. The exhibit featured presentations of the martyrs' personal belongings that had been collected, such as clothing and "tools" they used, along with an introduction to their lives and deeds until the day of their "martyrdom."

80.     Accordingly, the Bank's financial and ideological support for the Second Intifada is a matter of public record and its participation in diligently implementing the universal terrorist death and dismemberment insurance scheme is knowing and deliberate.

81.     Defendant Arab Bank knowingly, willingly and substantially assists in the recruitment of terrorists.

82.     Any person who chooses to participate in a suicide bombing or other terrorist attack does so secure in the knowledge that if he or she is killed in that attack, the financial needs of his or her family will be satisfied for some time.

83.     All of the families of all of the terrorists who killed or injured the plaintiffs in this action were eligible to receive the terrorist death and dismemberment insurance payments outlined above and administered by Arab Bank.

84.     This is equally true of the families of terrorists who were injured or apprehended.

85.    In short, the Saudi Committee raises funds from private donors in Saudi Arabia and elsewhere in the Persian Gulf region and then allocates payments to defendant Arab Bank to fulfill its public pledge of universal insurance coverage to Palestinian terrorists.

86.    The terrorist organizations, through their charitable fronts, collect data on their own operatives as well as all other terrorists killed, injured or in Israeli custody and transmit the information to the Saudi Committee and defendant Arab Bank.

87.    Through the program administered by Arab Bank, the Saudi Committee paid and transmitted death benefits to approximately two hundred (200) fallen "martyrs" in the first year of its existence alone.  As of November 2001, the Saudi Committee paid more than forty-two million dollars ($42,000,000.00) to terrorists and/or their beneficiaries.  According to Arab Bank's Chief Banking Officer, Shukry Bishara, Arab Bank has transmitted ninety million dollars ($90,000,000.00) to Palestine on behalf of the Saudi Committee to "institutions and individuals alike."

88.    In fact, Arab Bank serves as the exclusive administrator for the Saudi Committee's universal terrorist death and dismemberment insurance plan for Palestinian terrorists and their families.

89.    Indeed, in its original website, the Saudi Committee openly declared that its funds were transmitted and distributed to the families of martyrs through local branches of the Arab Bank in Palestine.  Although it has since been removed from the internet, the original archived webpage located at www.alquds-saudia.org\indexa.htm provided a list under the caption: "What has been done with your donations?"

90.    Item number ten (10) on the web page responds with the answer: "Opening a bank account for every entitled [Palestinian] through the Arab Bank in Palestine."

91.     The website further listed numerous "martyrs" whose cause of death was listed as "suicide attack."

92.     Similarly, in the annual report issued by the Saudi Committee and published in the Saudi newspaper *Al-Jazira* on February 11, 2001, the Saudi Committee identifies payments made to Palestinian prisoners as well as Palestinian "martyrs." Notably, Table 4, Column 10 of the report helpfully identifies the cause of death for each martyr.

93.     For example, Musa Abd al-Qadir Ghanimat, the HAMAS operative who perpetrated a suicide attack at the Apropo Cafe in Tel Aviv is listed as an illustrative martyr.

94.     Accordingly, the terrorist death and dismemberment insurance plan includes the families of suicide bombers, and the defendant Arab Bank and its senior management possess knowledge of this fact.

95.     Defendant Arab Bank provides a convenient means for transmitting and distributing this universal terrorist death and dismemberment insurance coverage plan across Palestinian controlled territories that would be far more difficult if attempted by other means such as courier. Israeli territory separates Gaza from the West Bank and Israeli military checkpoints often separate one Palestinian city from another.

96.     Arab Bank makes it possible for the terrorist groups to transcend physical obstacles and to provide an organized and professional distribution system that literally underwrites the terror campaign.

97.     Arab Bank knows the criminal purpose that the accounts it opens and maintains for the Saudi Committee are intended to serve.

98.     The Saudi Committee and local HAMAS charitable front organizations have publicly and repeatedly advertised that purpose in both Saudi and Palestinian newspapers, on

television and on the Saudi Committee's website, all of which are known to or should be known to Arab Bank and all of which are calculated to – and do – reach terrorists and potential terrorists. For instance:

- In the February 10, 2001 edition of the Saudi newspaper *Al-Jazirah*, the Saudi Committee published an annual report in which it listed the names of Palestinian prisoners to whom it provided terrorism benefits as well as the names of the Palestinian martyrs (including the names of those killed in suicide bombings) whose families received terrorism death benefits;

- In a November 23, 2001 edition of the Palestinian newspaper, *Al Quds*, the Saudi Committee placed an announcement listing the names of more than 1,000 individuals who had been injured during the Second Intifada or held in Israeli custody and invited them or their families "to go to the branches of the Arab Bank in their places of residence to receive their allocations donated by the Committee..."; and

- In a February 18, 2002 advertisement in the Palestinian newspaper *Al Hayyat Al Jedida*, a HAMAS charitable front organization in Ramallah announced that the Saudi Committee "requests that the families of the martyrs whose names are listed herein to go to a branch of the Arab Bank in their place of residence to receive the tenth payment offered by the Saudi Committee in the amount of $5,316.06 ...."

99.     Since the Saudi Committee raises its funds in Saudi currency, which cannot conveniently be converted into Israeli currency (most commonly used in Palestinian controlled areas), those funds are primarily converted into U.S. dollars through the New York branch of Arab Bank and then routed to the local branches of Arab Bank in the West Bank. Arab Bank's role is material and essential to the furtherance of the criminal conspiracy in two (2) important respects.

100.     First, Arab Bank provides both professionalism and transparency to the process thereby reassuring wealthy Saudi and Gulf State donors that the money they are contributing will not be siphoned off by corrupt officials, but will in fact reach the families of terrorists as intended.

101.    Second, Arab Bank, through its network of local branches in the West Bank and Gaza, provides an ideal distribution system that offers both convenience to the families of the terrorists who are able to bypass both the corruption of the Palestinian Authority and the uncertainty of cash payments delivered by courier and the certainty of an accounting system that minimizes the risk of duplicate payments and unreliable record-keeping.

102.    By knowingly and actively participating in this process, Arab Bank and its co-conspirators, the Saudi Committee and others, have knowingly aided and abetted each and every terrorist act committed by Palestinian terrorists since the formation of the Saudi Committee's universal terrorism death and dismemberment insurance coverage scheme in October 2000 in violation of 18 U.S.C. § 2332, 18 U.S.C. § 2339A, 18 U.S.C. § 2339B and 18 U.S.C. § 2339C and common law torts of aiding and abetting, conspiracy and intentional infliction of emotional distress.  Arab Bank has knowingly participated in the process for the purpose of supporting and providing financial assistance to terrorists, including, but not limited to HAMAS and other designated Foreign Terrorist Organizations, agents of HAMAS and other HAMAS-controlled organizations, families of HAMAS operatives and the families of other terrorists.

**Defendant Arab Bank Provides Material Support To Foreign Terrorist Organizations**

**1. The Middle East**

103.    HAMAS raises funds to support its terrorist acts through charitable front organizations which it controls.

104.    Arab Bank knowingly provides banking services to these charitable committees and affirmatively assists them in collecting, receiving, transmitting and distributing funds to support the Second Intifada terror campaign.

105.    Arab Bank knowingly provides banking services to HAMAS directly through its

20

Al-Mazra Branch Account # 3-810-622473-0330 in Beirut which collects funds directly in the name of HAMAS, and through charitable front organizations controlled by HAMAS which Arab Bank affirmatively assists in distributing funds to support the terror campaign.

106.    The United States Department of Justice has, for example, identified the website: www.palestine-info.com as the "official" website of HAMAS[2]. The website itself solicits funds and asks contributors to send money to its Al-Mazra Branch Account # 3-810-622473-0330 at the Arab Bank in Beirut, but it also asks donors "to cite only the account number and not the name of the [Palestine Information] Center or any other names."

107.    This request is necessary because Account # 3-810-622473-0330 is one of the few accounts that Arab Bank operates on behalf of HAMAS and which HAMAS controls and maintains directly.[3]

108.    To assist it in carrying out its terrorist activities, HAMAS has established numerous front organizations, including, but not limited to:

    i.        Al-Ansar Charity;

    ii.        Ramallah Charitable Committee;

    iii.        Tulkarem Charitable Committee;

    iv.        the Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya;

    v.        Al Mujama Al-Islami;

    vi.        Nablus Charitable Committee;

    vii.        Jenin Charitable Committee;

---

2 The website has since migrated to a new "URL" and can be found at www.palestine-info.info
3 According to the defendant, since the filing of the initial related case of *Linde v. Arab Bank Plc,* CV 04 2799, in July of 2004, the bank has investigated this allegation and has since closed the account, frozen its funds and "reported it to the appropriate authorities."

       viii.      Islamic Charity Society of Hebron;

       ix.      Islamic Charitable Society Al-Bireh; and

       x.      Al Islah Charitable Society

109.    Arab Bank provides direct financial services to Al-Ansar Charity, Ramallah Charitable Committee, Tulkarem Charitable Committee, the Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya, Nablus Charitable Committee, Al Mujama Al-Islami, Jenin Charitable Committee, Islamic Charitable Society Al-Bireh and Al Islah Charitable Society.

110.    The Tulkarem Charitable Committee, Nablus Charitable Committee, Ramallah Charitable Committee, Jenin Charitable Committee and Islamic Charity Society of Hebron have all been identified by United States Department of Justice as HAMAS front organizations and the management of each of these "charities" is in fact controlled by HAMAS operatives.

111.    The Tulkarem, Ramallah and Jenin Charitable Committees and Islamic Charity Society of Hebron were all designated as "Unlawful Organizations" by the government of Israel in February 2002 because of their connection to HAMAS.

112.    Arab Bank provides financial services to agents of HAMAS through the following accounts, among others, in the West Bank and Gaza Strip:

       (1)      Tulkarem Charity Committee a/k/a Lajna Zakat Tulkarem Account No. 9070-500010-6-510.

       (2)      Tulkarem Charity Committee Account No. 510/0/500010/970.

       (3)      Tulkarem Charity Committee (Jordanian Dinar) Account No. 500/0/106500.

       (4)      Tulkarem Charity Committee (Euro Account) Account No. 500010-6/596.

       (5)      Charity Committee of Ramallah a/k/a Ramallah Zakat Committee. Account No.510/0/610686

(6)    Charity Committee of Ramallah Account No. 510/0/610686-9030

(7)    Charity Committee of Ramallah Account No. 510/2/610686

(8)    Nablus Zakat Committee Account No. 500/0/400336-0193

(9)    Islamic Charitable Society Al-Bireh Account No. 510/7/602835

(10)   Al-Mujama al-Islami 6-5/500

(11)   Al-Mujama al-Islami 6-0/510

(12)   Islamic Charity Society of Hebron Account No. 510/0/9040-750049

(13)   Islamic Charity Society of Hebron Account No. 510/2/9030-610686

113.   Arab Bank provides direct financial services to Al-Ihsan Charitable Society and knowingly maintains accounts for Dar al-Huda Society in U.S. Dollars, Israeli Shekel and Jordanian Dinar.

114.   The terrorist affiliations of the various charitable front organizations is hardly clandestine nor are there activities unknown to the management of Arab Bank.  For example, the HAMAS charitable front, Al-Ansar Charity maintains a website proclaiming that:

> Al-Ansar Society opens its doors to the families of the martyrs who intend to register their dead who, with their splendid blood, saturated pure Palestine and drew the lines of liberty and the coming dawn.  The Al-Ansar Society is following in their footsteps and shares in the sorrow and the hopes of the families of the martyrs and their relatives.

115.   The website further boasts that it has given money to Palestinians who were wounded, incarcerated or killed during the Second Intifada, including six thousand dollars ($6,000.00) to the family of Iz Aldin (also spelled: "Azzadin") Al Masri, the suicide bomber who massacred fifteen (15) people, including seven (7) children. Al Masri also murdered and maimed

23

several Americans including Judith Greenbaum and JoAnne Nachenberg at the Sbarro pizzeria in

downtown Jerusalem on August 9, 2001.

116.    The website of Al-Ansar helpfully explains that:

The Director General of the Al-Ansar Charitable Society and the person in charge of the portfolio for the care of the martyrs at the Society's website said that the Society has furnished the management of the Arab Bank with lists of names of the martyrs and the families of the entitled beneficiaries, in order to pay the monies to which the martyrs are entitled.

117.    Al-Ansar maintains an account with the Arab Bank in Gaza.

### 2. Europe

118.    Arab Bank provides financial services to agents of HAMAS by maintaining bank

accounts for the following **designated Foreign Terrorist Organizations affiliated with**

**HAMAS**:

(1)    The Association de Secours Palestinien (ASP) – Arab Bank, Zurich

(2)    Commite de Bienfaisance et de Secours aux Palestiniens (CBSP) – Arab Bank, Paris

(3)    Palestinian Association in Austria – Arab Bank, Paris

### 3. New York

119.    Defendant Arab Bank has also knowingly laundered funds for the Holy Land

Foundation for Relief and Development ("HLF"), a Texas based "charity" which has raised funds

in the United States for HAMAS for more than a decade. Arab Bank, in turn, channeled tens of

thousands of dollars for HLF through its New York branch to the Ramallah Charitable

Committee, the Tulkarem Charity Committee and the Charitable Society of Hebron, all agents of

HAMAS.

120.    On March 15, 1996, a feature article in *The New York Times* detailed the financing of HAMAS by so-called charitable organizations.  The article specifically discussed Israeli government claims that HLF was a "key fundraising operation" for HAMAS.

121.    On May 6, 1997, the government of Israel designated HLF as a HAMAS front organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks …."

122.    Arab Bank nonetheless claims to have a "highly professional relationship" with Israeli authorities.

123.    On September 25, 1997, the Palestinian Authority closed what it identified as 16 HAMAS institutions and associations.  HLF's Gaza office was one of the entities (temporarily) closed by the Palestinian Authority.  The closure, including identification of HLF as a targeted HAMAS entity, was detailed in a *Jerusalem Post* news account on September 28, 1997.

124.    HLF and its officers have been criminally indicted in the United States District Court for the Northern District of Texas for providing material support to a designated Foreign Terrorist Organization (HAMAS) – including for specific transactions involving payments made by HLF to the Ramallah Charitable Committee, Tulkarem Charitable Committee, and the Islamic Charity Society of Hebron.

125.    The indictment specifies particular financial transactions initiated by HLF that resulted in monetary transfers to the Ramallah Charitable Committee, Tulkarem Charitable Committee, and the Islamic Charity Society of Hebron which violate 18 U.S.C. § 2339B.

126.    On January 10, 2001, a federal district court in Illinois rendered a decision declining to grant a motion to dismiss in a case initiated by the parents of David Boim, who was killed by a HAMAS terrorist in 1997.  The Boims had sued HLF, among others, for providing

material support to HAMAS, a designated Foreign Terrorist Organization.

127.    Nonetheless, Arab Bank continued to deposit HLF fund transfers and credit the Arab Bank account of the Ramallah charitable front even after the *Boim* case placed the defendant on further notice of HLF's criminal activities.

128.    Similarly, the New York branch of the Arab Bank has facilitated the transfer of significant sums to the Tulkarem Charitable Committee and other agents of HAMAS despite the fact that in some cases both the "donor" of the funds as well as the recipient had been previously formally designated as "Unlawful Organizations" by the Israeli government.[4]

129.    Moreover, following the Israeli army's military operations in the spring of 2002, the government of Israel obtained and subsequently disclosed extensive materials (most of them available on the internet) demonstrating the Tulkarem Charitable Committee's connections to HAMAS and the Islamist movement.

130.    Nonetheless, Arab Bank and its New York branch continue to convert substantial sums of money and forward tens of thousands of dollars from New York to the Tulkarem account of the Tulkarem Charitable Committee at the Arab Bank and to other known HAMAS fronts.

**Cultivation of the Culture of Death**

131.    The charitable front organizations play a central role in financing the terror campaign by providing the means of raising funds to maintain the institutions that serve as recruiting grounds for terrorist organizations.

---

4 One of the signatories on the Tulkarem Charitable Committee account is Ammar Tawfiq Ahmad Badawi, a prominent member of the Muslim Scholars Association who was a signatory on the infamous *Fatwa* – or Islamic religious ruling – declaring that suicide bombings are permitted by Islamic law. Mr. Badawi is a leading figure in HAMAS.

132.    As set forth in an internal HAMAS memorandum recently captured by the Israeli army during a raid of the offices of the Hebron Charitable Committee, HAMAS has arranged for the "transfer [of] large sums" to the charitable committee and other HAMAS front organizations through the "charity activities" of their operatives abroad.

133.    The memorandum emphasizes that HAMAS "require[s] new bank account numbers for money transfers" and promises that HAMAS will:

> invest efforts to transfer money for the martyrs (the shahids) and prisoners, via the transfer [to] charitable institutions.  This is a primary goal in the framework of the effort to transfer aid money to these institutions, so that these budgets are released in the best manner and in order to bring about an improvement in the level of the movement's performance.

134.    The memorandum concludes with the promise that HAMAS will continue to "build up the activities and operations" of its front organizations by, among other things, "*taking advantage of the conditions and the atmosphere of death*."

134.    The financial support provided by the Saudi Committee via the Arab Bank as well as the accounts maintained by the terror organizations' charitable fronts constitutes the backbone of the donor base and operational budgets of HAMAS and has allowed it to expand its operations, attract more recruits, and professionalize its financial distribution channels.

135.    Each of these front organizations officially holds itself out to the public as a charitable organization with a purely humanitarian and benign purpose.  In fact, however, the primary mission of these organizations is to raise and launder funds for terrorist organizations and otherwise to coordinate and conduct activities that are essential to the conduct of terrorist operations and to the material support of terrorist operations.

136.    Funds raised by the charitable front organizations are fungible and are allocated in part to terrorist activities or used to free up other funds that are then allocated for terrorist

27

activities.

137.    In addition to the Saudi Committee's universal terrorist death and dismemberment insurance coverage plan, contributions from individual and corporate sponsors abroad are primarily made to the charitable front organizations. The front organizations make those contributions available to HAMAS in accordance with the instruction of their leaders. These organizations then disburse a percentage of the funds they receive from their front organizations to purchase weapons and explosive materials, to recruit and train operatives and otherwise to plan and carry out terrorist attacks.

138.    By knowingly providing banking and administrative services to charitable front organizations that are controlled and directed by designated Foreign Terrorist Organizations, including collecting, transferring and laundering funds for those organizations through its New York branch, Arab Bank has substantially assisted HAMAS in the furtherance of a murderous conspiracy to commit multiple acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2332 and has committed numerous overt acts in furtherance of the conspiracy.

139.    Indeed, had the doors of Arab Bank not been opened to HAMAS during the past four years, the leaders of these terrorist organizations would have had to make far more onerous arrangements for transfer of foreign contributions to terrorists within Palestinian-controlled territory and the great bulk of those funds would likely have never reached their destination.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### AIDING AND ABETTING THE MURDER, ATTEMPTED MURDER AND SERIOUS BODILY INJURIES TO UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); 18 U.S.C. § 2332(c) AND 18 U.S.C. § 2333(a)

140. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

141. Each of the plaintiffs has been injured in his person, property or business by reason of acts committed by Palestinian terrorists that involve violence or are dangerous to human life and that violate the criminal laws of the United States, including the prohibition on killing, attempting to kill, causing serious bodily injury or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

142. The acts of the Palestinian terrorists in killing, and attempting to kill U.S. nationals and other persons were and are intended to: (a) intimidate or coerce the civilian population of Israel, (b) influence the policy of the government of Israel by intimidation or coercion, and (c) affect the conduct of the government of Israel by mass destruction and murder.

143. The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of and intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reason of those acts.

144. The extraordinary financial and administrative services that Arab Bank has provided to the terrorists and their families, and to HAMAS, including administering universal terrorist death and dismemberment insurance coverage to the families of suicide bombers and

other terrorists, provides substantial assistance to HAMAS and others in recruiting and incentivizing suicide bombers and other terrorists and because money is fungible, in freeing up funds for use in military operations and the commission of violent acts resulting in death and injury, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. § 2332 that have caused injuries to the plaintiffs.

145.    The defendant Arab Bank knows that it is providing material support for acts of international terrorism, as is evidenced by its close contact with the Saudi Committee and its coordination of the payment schedules and lists of martyrs, and the repeated public advertisement of the activities of the Saudi Committee in various Palestinian newspapers as set forth above.

146.    As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal terrorist death and dismemberment insurance coverage plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

147.    Throughout the period in which it has provided these extraordinary financial and administrative services to HAMAS, and to individual terrorists and their families, the Arab Bank knew that the charitable front organizations of the terrorist organizations have played a major role in raising funds for HAMAS and others, which have committed numerous criminal acts including suicide bombings intended to intimidate and coerce the civilian population of Israel and to influence the policy of the Israeli Government.

148.    Throughout the period in which it has been involved in activities assisting HAMAS and individual terrorists and their families, Arab Bank knew that those activities have substantially assisted and encouraged dangerous and criminal acts set forth herein.

149.    By aiding and abetting violations of 18 U.S.C. § 2332 that have caused each of the plaintiffs to be injured in his or her person, property, or business, Arab Bank is jointly and

severally liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that plaintiffs have sustained as a result of such injuries.

## SECOND CLAIM FOR RELIEF

### CONSPIRACY TO COMMIT MURDER AND ATTEMPTED MURDER OF UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. §§ 2332(b) and 2333(a)

150.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

151.    Each of the plaintiffs has been injured in his person, property or business by reason of acts committed by Palestinian terrorists that involved murder or attempted murder in violation of the criminal laws of the United States, including the prohibition on killing or attempting to kill U.S. citizens as set forth in 18 U.S.C. § 2332.

152.    The acts of the Palestinian terrorists in killing or attempting to kill U.S. citizens and other persons were intended to: (a) intimidate or coerce the civilian population of Israel, (b) influence the policy of the government of Israel by intimidation or coercion, and (c) affect the conduct of the government of Israel by mass destruction and murder.

153.    The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of, and intention to, cause extreme physical pain and suffering to any and all persons within the close proximity of the attack and extreme emotional distress to the family members of those who were injured or killed by reason of those acts.

154.    Arab Bank agreed to combine with other persons to act unlawfully, in the manner set forth in this complaint and committed overt acts in furtherance of the conspiracy. At all relevant times, Arab Bank knew of the conspiracy and knew and knows, in particular, of the roles of the charitable front organizations and their leaders in furtherance of that conspiracy. Arab

31

Bank knowingly and purposefully agreed to perform extraordinary banking and administrative services for the Saudi Committee, HAMAS and others with the knowledge, and for the purpose, that such services facilitate the activities of its leaders and support terrorist activities pursuant to a common scheme to encourage and incentivize acts of terrorism. Arab Bank's actions, in fact, facilitated the conspiratorial scheme because, as set forth more fully above, but for the actions of the Arab Bank, the funding of the universal terrorist death and dismemberment insurance coverage for terrorists and their families would have been substantially more difficult to implement.

155.    By conspiring to act with the Saudi Committee, HAMAS and its respective charitable front enterprises to support, encourage and facilitate violations of 18 U.S.C. § 2332 that have injured each plaintiff's respective person, property, or business, Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that plaintiffs have sustained as a result of such injuries.

### THIRD CLAIM FOR RELIEF

### PROVISION OF MATERIAL SUPPORT TO TERRORISTS
### IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333(a)

156.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

157.    The extraordinary financial and administrative services that Arab Bank has knowingly provided to the terrorists, their families, and to HAMAS, including serving as the exclusive administrator of universal terrorist death and dismemberment insurance coverage plan to the families of suicide bombers and other terrorists, provides material support to the preparation and carrying out of numerous acts of international terrorism which have caused direct injury to the

plaintiffs.

158.    As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal terrorist death and dismemberment insurance plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

159.    By participating in the commission of violations of 18 U.S.C. § 2339A that have caused each of the plaintiffs to be injured in his or her person, business or property, defendant Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that plaintiffs have sustained as a result of such injuries.

## **FOURTH CLAIM FOR RELIEF**

### **COMMITTING ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)**

160.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

161.    By knowingly transferring funds from and to agents of HAMAS, including the Holy Land Foundation, maintaining accounts for and collecting, receiving and transmitting funds for Specially Designated Global Terrorists affiliated with HAMAS such as the Association de Secours Palestinien (ASP);  the Commite de Bienfaisance et de Secours aux Palestiniens (CBSP); and the Palestinian Association in Austria; by maintaining accounts for and collecting, receiving and transmitting funds for known agents of HAMAS such as the Tulkarem Charitable Committee and the Ramallah Charitable Committee, defendant Arab Bank and its New York branch office have provided material support to designated Foreign Terrorist Organizations under the Anti-Terrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. §§ 2339B(a)(1).

162.    As set forth more fully above, but for the assistance provided by the Arab Bank,

the funding of the universal terrorist death and dismemberment insurance plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

163.    Based on the defendant's level of sophistication and presence as a federally regulated financial institution in the United States, defendant Arab Bank not only knew of the unlawful activities of HAMAS but also knowingly disregarded its actual designation as a Foreign Terrorist Organization and the designation of Association de Secours Palestinien (ASP); the Commite de Bienfaisance et de Secours aux Palestiniens (CBSP); and the Palestinian Association in Austria as a Specially Designated Global Terrorist.

164.    By providing material support to a designated Foreign Terrorist Organization, Arab Bank is therefore civilly liable for damages to these plaintiffs who were injured by HAMAS pursuant to 18 U.S.C. § 2333(a).

## FIFTH CLAIM FOR RELIEF

### FINANCING OF TERRORISM IN VIOLATION
### OF 18 U.S.C. § 2339C and 18 U.S.C. § 2333(a)

165.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

166.    The financial services that Arab Bank has willfully and unlawfully provided to HAMAS and the Saudi Committee include the giving, raising, collecting and transmitting of funds with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians such as the victims of the terrorist acts described in this complaint, who were not taking part in any armed conflict.

167.    As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal terrorist death and dismemberment insurance coverage plan for

terrorists and the families of terrorists would have been substantially more difficult to implement.

168.    By willfully violating 18 U.S.C. § 2339C, Arab Bank is therefore jointly and severally liable to the plaintiffs who have suffered injuries to their business, person or property by reason of such acts under 18 U.S.C. § 2333(a).

### SIXTH CLAIM FOR RELIEF
### COMMITTING ACTS OF INTERNATIONAL TERRORISM
### IN VIOLATION OF 18 U.S.C. § 2333(a)

169.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

170.    Defendant Arab Bank's acts of providing banking and other services, including the provision of death benefits, to HAMAS and other international terrorists, were "a criminal violation if committed within the jurisdiction of the United States or of any State" and "appear to be intended to intimidate or coerce a civilian population . . . to influence the policy of a government by intimidation or coercion or to affect the conduct of a government by mass destruction" within the meaning of 18 U.S.C. § 2331.

171.    The extraordinary financial and administrative services that Arab Bank has provided to the terrorists, their families, and HAMAS, including administering universal coverage insurance to the families of suicide bombers and other terrorists, provides substantial assistance to HAMAS and others in recruiting and incentivizing suicide bombers and other terrorists and thereby preparing and facilitating acts of international terrorism in violation of 18 U.S.C. § 2333(a) that have caused injuries to the plaintiffs.

172.    Arab Bank's acts were dangerous to human life, by their nature and as evidenced by their consequences.

173.    Arab Bank's acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

174.    Accordingly, Arab Banks' acts constitute acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2333(a).

175.    Arab Bank knowingly provided substantial assistance to acts of international terrorism and accordingly, its acts constitute aiding and abetting acts of international terrorism.

176.    Arab Bank also agreed to combine with other persons to act unlawfully in the manner set forth above and committed overt acts in furtherance of the conspiracy. At all relevant times, Arab Bank knew of the conspiracy and knew, and knows, in particular, of the roles of the charitable front organizations and their leaders in furtherance of that conspiracy. As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal coverage death and dismemberment benefits plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

177.    The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of and intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reason of those acts.

178.    Throughout the period in which it has been involved in activities assisting HAMAS and individual terrorists and their families, Arab Bank knew or recklessly disregarded the fact that those activities have substantially assisted and encouraged dangerous and criminal acts set forth herein.

179.    For the reasons set forth above, Arab Bank is therefore civilly liable for damages to plaintiffs for injuries to their person, property or business by reason of the acts of international terrorism  pursuant to 18 U.S.C. § 2333(a).

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs Netanel Miller, Chaya Miller and Arie Miller pray that this Court:

      (a)     Accept jurisdiction over this action;

      (b)     Enter judgment against Arab Bank and in favor of each plaintiff for compensatory damages in amounts not less than those set forth herein and additional sums in amounts to be determined at trial;

      (c)     Enter judgment against Arab Bank and in favor of each plaintiff for treble damages pursuant to 18 U.S.C. § 2333(a);

      (d)     Enter judgment against Arab Bank and in favor of each plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

      (e)     Enter an Order declaring that Arab Bank has violated, and is continuing to violate, the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.; and

      (f)     Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: November 28, 2005
        Oradell, New Jersey

                OSEN & ASSOCIATE, LLC

                By _Aaron A. Schlanger_
                Gary M. Osen (GO-5790)
                Aaron A. Schlanger (AS-9372)
                Peter Raven-Hansen, Of Counsel
                700 Kinderkamack Road
                Oradell, New Jersey 07649
                (201) 265-6400

                Attorneys for Plaintiffs

KOHN, SWIFT & GRAF, P.C.
Robert A. Swift
Steven M. Steingard
One South Broad Street
Philadelphia, PA 19107
(215) 238-1700